THE STATE, THE BOARD OF HEALTH OF THE CITY OF
TRENTON, relator,

*v.*

JOHN P. HUTCHINSON AND ALEXANDER JACOBUS.

The former owner of a hotel in Trenton applied to the common council of
the city, and obtained, by ordinance, permission to lay a drain and sewer-pipe
from the hotel through a street to a small natural stream of water. The ordi-
nance contained a provision, that if such pipe should become a nuisance (upon
which the opinion of the common council should be final and conclusive), the
owner, his heirs or assigns, would remove it. The hotel is now owned by one
of the defendants, the other being his lessee. The board of health of the city
of Trenton filed a bill, in the name of the state, to enjoin the use of the pipe
for discharging the filth of the hotel into the stream, as a nuisance detrimental
to public health; and the evidence shows that its use is a public nuisance.—
*Held,* that the injunction should be allowed, although other persons also dis-
charged their filth into the stream; and although the statutory requisites as to
the organization of boards of health had not been strictly complied with by
complainants; and although the ordinance had never been repealed, and the
defendants insist that the license thereby granted is in the nature of a contract
and irrepealable.

Mr. *James Buchanan* and Mr. *G. D. W. Vroom,* for com-
plainant.

Mr. *William M. Lanning,* for defendants.

BIRD, V. C.

In 1876, Bartlett being the owner of the premises in the city
of Trenton known as the "American House," applied to the
common council for permission to lay a drain-pipe from said
premises, through West Hanover street to Petty's run. The
council passed an ordinance giving him such permission. One
section of the ordinance provided that if such pipe should be-
come a nuisance, or injurious or dangerous to the public, upon
which the opinion of the council should be final and conclusive,

the said Bartlett, his heirs or assigns, should cause the same to be removed, and if he did not remove it after notice, the council might. He laid the pipe. In 1878 the said John P. Hutchinson became the owner of the premises in fee. The defendant Jacobus is lessee.

In the said American Hotel are eight water-closets, three urinals, two sinks, and three lavatories, all of which are connected by pipes with said drain, so that all the matter, liquid or solid, which is cast or deposited in those places is carried off and discharged into said Petty's run. The hotel is a large one. The ordinary daily occupants are about forty-five, and at times, for a day or two, and sometimes for a longer period, about one hundred and fifty. These all have access to and use the water-closets, urinals, and the like, to which are added all kitchen slops and water used in laundry work.

This stream passes near to the hotel property, but not adjoining. It also passes along and through a thickly-peopled portion of the city. Its natural bed was about eight feet wide, which is now narrowed by supposed improvements to two or three in places. In some places there is declivity enough to admit of a rapid flow of water, while in others the surface is so nearly level that the flow is very sluggish. This flow is hindered, too, by a rough and irregular bottom, composed of earth and of large and small stones or gravel. In a dry season it passes but little water, but is capable, by its formation, of retaining an immense amount of filth.

The board of health has adjudged that the depositing of all the matter which goes into the water-closets, urinals &c. in the hotel through the said drain, into the said Petty's' run, is a nuisance and hazardous to the public health, of which it gave the defendants notice. To this notice the defendants gave no heed.

The board of health filed this bill, as they had a right to under the statute, and therein ask this court to restrain the defendants from the use of said pipe to discharge the matters above indicated into said run.

The defendants have answered. A large number of most intelligent and respectable witnesses have been examined.

The defendants urge that the manner in which they use this stream to carry away the hotel filth is not a nuisance, and in no way hazardous to public health. In this respect, as the testimony stands, they are mistaken. The great, the decided, preponderance of testimony is against them. Whatever conclusions may be reached from isolated facts, when those facts are presented in a body they carry the mind at once to the conviction that the defendants are doing violence to their neighbors and fellow citizens.

It has been pressed upon my attention that many others are equally or more guilty. This I cannot consider. I allowed some testimony on this point, not because I thought it admissible, but that the defendants might be heard above, if I should be in error. I think each one is separately liable for the nuisance to which he contributes. It is no shelter to the one charged that another may have aided directly or remotely, or otherwise.

Again, counsel insist that this board of health has no authority to prosecute; that it has not shown itself to be within the statute. It is urged that, being a special tribunal, created for special purposes and clothed with definite powers, it must prove that it has walked according to the line prescribed in every particular, and that any departure is fatal to the entire work undertaken. This admits, however, and so the counsel frankly stated, the legal existence of the board of health in the city of Trenton.

But the power or right of this board to institute proceedings in this court is denied. It is denied that the board of health referred to in section 9 of the act of 1883 (*P. L. 1883 p. 122*) in any sense, includes the board of the city of Trenton. That section declares that any such board of health, instead of proceeding in a summary way to abate a nuisance, or such source ·of foulness, may file a bill in the court of chancery. It will be ·observed that it says any *such* board. If we follow the ordinary rule, we will look for the antecedent of " such." This we find in the section immediately preceding (the ninth). That section provides that whenever any board of health now organized, or which may be hereafter organized, under the laws of this state, as referred to in section 1 of this supplement to an act entitled "An

Trenton Board of Health v. Hutchinson.

act relating to local boards of health," approved March 22d, 1881, shall be notified that a nuisance or other source of foulness, hazardous to the public health, exists within the territory within which the board of health has jurisdiction or control, such board may examine the matter in a summary way, and order and cause the same to be abated. Now, when the words " such board may examine the matter in a summary way " are looked at in connection with the words " that any such board of health instead of proceeding in a summary way " &c. in the very next (tenth) section, which gives the authority to sue, it will be found, I think, beyond dispute, that the antecedent to the phrase *any such board,* in the latter section, is found in the one immediately preceding, in which and in which only is used the additional phrase " summary way."

Hence, of course, the inquiry : Does section 9 of the act of 1883 comprehend the board of health of the city of Trenton ? I think, if it does not, it has no right to come into this court. Let us attend to the language of that section. It says, whenever any board of health *now* organized, or which may be hereafter organized, under the laws of this state, as referred to in section 1 of this supplement, being the act of March 22d, 1881. *P. L. p. 160.* It says as referred to in section 1 of this supplement, and section 1 refers to the act of March 11th, 1880, and to a supplement of March 31st, 1882, and also to the act of March 22d, 1881. So that, most evidently, the boards of health which may proceed in a summary way, mentioned in the ninth section of the act of 1883, are any and all such as are authorized by either of the acts above named.

Is the relator such a board ? Again, let us attend to the language of the law. The first section of the act of 1880 (*P. L. p. 206*) reads :

" That any city or borough, or incorporated town, or any town governed by a commission, shall have a board of health of not less than five, or more than seven members, of which the keeper or recorder of vital statistics, and also one city physician and city health inspector, shall be members, if there be such officer or officers; and the said board of health shall be nominated by the mayor and approved by the common council, or other governing body of

the city, borough or town, to serve for not less than three years, but not more than three of the number shall go out of office at any one time."

This section declares that every city shall have a board of health. But it is said that such board does not come within the purview of the section last recited. The claim is that this board is the creature of the common council of the city, and that it has not and cannot have any other paternity. It is said that the council solemnly and formally organized and established it. It is true that July 11th, 1882, the council did, in the name of the inhabitants of the city of Trenton, ordain that there should be a board of health established in the city of Trenton, and that the same should be organized in accordance with the provisions of an act entitled "An act concerning the protection of the public health, and the record of vital facts and statistics relating thereto," approved March 11th, 1880, and the supplements thereto. From this it would appear that the council only intended to bring the case within the act referred to and its supplements. This ordinance required the mayor to nominate men as members of the board of health, and to send such nominations to the council for its approval. The first section of the act of 1880 requires the mayor to nominate members of such board, and the council to approve of such nominations. The mayor made such nominations and the common council approved of them. All this purports, on its face, to have been done by virtue of the authority conferred by the act last cited.

In my judgment the law was substantially complied with. The statute says that said board of health shall be nominated by the mayor and approved by the common council. It did not require any ordinance. No preliminary steps are demanded by the statute. The first movement contemplated is the nominations by the mayor; and the second, the approval by the common council, both of which were taken effectually in this instance. Nothing else that was done could add to or detract from either the nominations or approval.

But now the nominations being made, and the approval given, it is urged that the prescribed statutory line has been departed from in the nominations of the health inspector and the physi-

cian.   The statute declares that one of the city physicians and the city health inspector shall be nominated as members of the board.   Therefore the mayor had no choice.   To this extent the legislature made the selection.   It is said one of the members must be one of the city physicians, and one the health inspector. And this brings us to what is regarded as the fatally weak spot in this branch of the complainant's case; that is, that, although the health inspector and one of the city physicians were appointed, their appointment was a nullity in this case, *because the period of time for which each of them held such office, or could hold such office under the city charter, was only one year, while the first section of the act directing the appointment, expressly says that said board shall be nominated " to serve for not less than three years."* Shall a beneficent public work, set on foot by the representatives of the people, fail in its mission because of this seeming irregularity ?   I feel myself bound to construe the act favorably to the relator.   The public are deeply interested; this is made most conspicuous by the title of the act, and every line which follows.   I must regard the object to be attained, or had in view by the legislature, viz., the preservation of the public health. *Sedg. on Stat. Const. 193.*   In matters between individuals arising under the statute of frauds, it has been repeatedly adjudged that the act should receive a liberal construction.   " It should be so construed as most effectually to meet the beneficial end in view, and to prevent a failure of the remedy."   *Potter's Dwar. on Stat. 73, 231*, approved by our court of errors, in *Randolph* v. *Larned, 12 C. E. Gr. 557, 560.*

And there are, I think, some authorities which bring the view as to liberal construction where third persons or the public are concerned, still nearer in relation to this case.   I refer to *Perth Amboy* ads. *Smith, 4 Harr. 52, 56, 57.*   In that case an overseer of the poor had neglected to take the oath of office, but acted as such officer.   The court held that he was overseer *de facto.* Hornblower, C. J., declared that such was the law, " in those cases where the public good imperatively requires an act to be done without delay, and where individuals have rights *ex debito justitiæ* against the public or other individuals which would fail

for want of a public functionary to act in the premises." *Hoag-land* v. *Culvert, Spen. 387 ; State* v. *Perkins, 4 Zab. 409.* In this case, the members of the common council who had not been legally sworn as such, imposed a tax, the collection of which was resisted on that ground ; but the court said "that the acts of officers *de facto* in which other parties or the public have an interest, are valid." *State* v. *Tolan, 4 Vr. 195, 201 ; People* v. *White, 24 Wend. 520, 525.* "A clerk of the court appointed by a judge *de facto,* is well appointed, and may hold his office, though the judge be ousted." *People* v. *Staton, 73 N. C. 546 ;* See, further, *Savage, Receiver,* v. *Ball, 2 C. E. Gr. 142 ; Ang. & A. on Corp.* § *287,* and *7 Bac. Abr. tit. " Offices" 283.*

Believing that the object of the legislature was to achieve some public good, and it being undisputed that the officers named were nominated and approved, and that they have acted as members of the board of health, with the numerous cases above cited and referred to before me, there seems to be nothing left for me to do but to regard the objection to the relator's right to sue, because the city physician and health inspector had not, under the city charter, terms of office of three years' duration, as untenable. If this objection were to prevail, it would only be by chance that any city could claim the advantages of the act. Every city must not only have the power to appoint such officers for three years, but they must actually make the appointment contemporaneous with the appointment of the board of health ; for the loss of a day or a week would as effectually bar as two years. If time be the important principle, its extent or duration must be wholly immaterial.

I conclude, therefore, the relator is such a body as is contemplated in the ninth and tenth sections of the act of 1883.

The counsel of defendants think the proceedings should fail, because the act of 1881 is unconstitutional. In my opinion, the arguments adduced do not reach this case.

The last point which claims attention is that of the protection which the defendants seek, under the license, to lay this drain-pipe, and to discharge the deposits in their urinals, water-closets &c. through such pipe into Petty's run. It is urged that such

license is in the nature of a contract, and irrepealable. This view does not commend itself to my judgment. I think that such a doctrine, were it to prevail, would be fraught with incalculable mischief, and would defeat all efforts towards the preservation of the public health. But is it possible that the ordinance itself, behind which defence is made, is of any validity? Can the common council authorize one man to discharge all the worst of filth which accumulates on his own premises upon his neighbor, or to deposit it under his door or window? Can it be possible that any legislature ever granted such extraordinary, hostile and destructive powers? Can it be possible that any court has adjudged that such license or such law was or is within the power of either council or legislature? Is it possible that one individual can thus acquire rights so vast against the rights of his neighbors in their property and in their health? I do not and cannot think so.

But whatever may have been the power of the common council of the city of Trenton, and whatever *privileges*, not *rights*, Bartlett acquired under the license, the legislature, in its wisdom, has enacted that whenever the board of health shall be notified that a nuisance or other source of foulness, hazardous to the public health, exists, such board may examine the same in a summary way and order or cause the same to be abated. The legislature has also enacted that any such board of health, instead of proceeding in a summary way to abate a nuisance or such source of foulness, may file a bill in the name of the state, on the relation of such board of health, for an injunction to prohibit the continuance of such nuisance or such source of foulness. This is without exception or qualification. This does not say "unless licensed." It comprehends every nuisance or source of foulness hazardous to the public health.

I think the relator was justified in filing the bill. I think the discharge of the water-closets and the like of the defendants into Petty's run, through the pipe named and described in the bill, is a nuisance and hazardous to the public health, and should be abated. I will so advise. The defendants ought to pay costs.